## DAVIS *et al. v.* KENT *et al.*

*Atkinson, J.*—There being sufficient evidence in support of all the material allegations of the plaintiffs' petition, to carry the case to the jury, it was error to grant a nonsuit.

August 12, 1895.                                   *Judgment reversed.*

Equitable petition. Before Judge Smith. Johnson superior court. September term, 1894.

The petition was filed by Bertha Davis, Rebecca Walker and others, as the children and only heirs at law of Bryant Kent, against Thomas W. Kent and Thomas Downs, to set aside a deed of conveyance from Bryant Kent to Thomas W. Kent, dated September 9, 1882, and to require an accounting from Thomas W. Kent as to the property conveyed; and to set aside a deed from Thomas W. Kent to Downs, conveying a portion of the property, which it was alleged Downs took with notice of the fraud alleged to have been practiced by Thomas W. Kent in procuring the deed first mentioned. A full report of the petition will be found in 89 *Ga.* 151. Afterwards an amendment was filed, alleging that Rebecca Walker had died leaving certain heirs; that there were no debts outstanding against her, and there had been no administration of her estate and there was no necessity therefor; and asking that these heirs at law be made parties plaintiff. This amendment was allowed. After the introduction of the evidence for plaintiffs, a motion for nonsuit was made and granted.

J. M. Hightower testified: I was at Thomas Kent's in September, 1882, and witnessed the deed from Bryant Kent to his brother Thomas. No one was present but Bryant and Thomas Kent, Col. Walter Daley and myself. Thomas

Kent asked me to go in the room with them and witness the deed. Bryant Kent was sick in bed at the time, and my recollection is that some of them helped him raise up in bed. I don't remember what was said, but think Thomas Kent said: "We have got that paper for you to sign." Bryant Kent asked no question about it. I think Daley guided his hand and assisted him in signing the deed. I think the deed was read over or explained to Bryant. At the time of signing the deed Bryant was not physically able to transact business. I continued to board at Thomas Kent's, and while there, talked often with Bryant Kent. He talked mostly about fishing and hunting, and could not connect his conversation, but would revert to original subject. He would commence to talk about anything, and then forget and seemed to get off. His mind seemed to be wavering and not clear. He told me he was some seventy years old. He looked like he was in very feeble health all the time. I often asked him how he was getting along, and he said he did not get any better. I don't think any one of good mind would talk like he did. He carried the mail from Wrightsville to Ricksville (about 21 miles) in 1883, but I can't say how long.—Dr. Morrison testified: I am a physician; became acquainted with Bryant Kent in 1881, and rendered him professional services. In the summer of 1882 I treated him for a slight stroke of paralysis, and had every opportunity, as his physician, of knowing his mental and physical condition, and then discovered that his mind was affected to some extent and his physical condition bad. It affected his mind and, of course, his will power. He was not capable of transacting and managing his business affairs. He was not so capable in the summer of 1882 when I first treated him. The latter part of 1882 or first of 1883 he left Montgomery county. In September, 1884, he came back on a visit, and I again treated him and found him incapable of attending to his business affairs, from both mental and physical incapacity.

The last time I treated him he had an attack of malarial fever at his brother's, and then he was moved to his daughter's, Mrs. Davis, and I visited him there, and the last I saw of him he was unable to speak from paralysis. I know about the time he sold his property to T. W. Kent, and his mind at that time was not good and in a condition to attend to business properly. My bill for professional services to Bryant Kent in the summer of 1882 was paid bv T. W. Kent. My second bill has not been paid, and I was informed by the attorney to whom I sent it that he had presented it to T. W. Kent who positively refused to pay it. In my professional opinion, from the summer of 1882 to September, 1884, Bryant Kent was incapable of transacting or managing his business. When I first visited him he had paralysis, which necessarily affected him permanently, mentally and physically. His mind might be better at times, but at no time clear. The last time I saw him in 1884 he had no mind at all, and was even unable to speak; his mind was weak and glimmering.—J. C. A. Wilcher testified: I knew Bryant Kent for thirty or forty years before his death. He lived in Glascock county until about 1880 and was a near neighbor of mine. We joined farms. He had a good home and farm when he lived in Glascock, and attended to his business well until the year before he left that county, but the last year he lived there, tried to work his farm in Glascock and one in Montgomery; would go back and forth with his stock, hands and plow-tools, and said when he moved he was going down to Montgomery county to make a living fishing and hunting, and he did not talk right. He could not connect his conversation. From his talk then and the way he managed in trying to cultivate a farm in each county, I was satisfied he had lost his mind to a great extent. The next time I saw him was in Wrightsville during September court, 1882, at the hotel kept by his brother Thomas Kent, and he did not know me until I told him who I was. He said he was most dead, and that he had to leave as he was most perished. From

these facts I am satisfied that at the time he signed the deed he was not capable of transacting business affairs.

Many other witnesses were introduced by plaintiffs, who testified that in their opinion, at the time of the making of the deed, Bryant Kent did not have mental capacity to make it, and who gave their reasons for so testifying. A nephew of Bryant Kent testified: Just before he made the deed to Thomas Kent, Bryant wanted to make me the deed to all his property, to take care of him and to settle up Jerusha Kent's estate of which he was administrator. He did not talk right at the time. I would not accept the deed, and told him he had better keep what he had, or give it to his children and let them take care of him. He said he could not stay with them; treatment from them was so bad. He told me he moved from Glascock to Montgomery for the purpose of fishing and hunting for a living. He left my home and came on to Thomas Kent's, but I do not think he staid there long. He came to Mrs. Dixon's, his daughter, and lived with her for some time, and died there in 1887. He did not seem to improve in health; his mind was better at times, though never clear up to his death. I had some talk, I think, with Thomas Downs, and I know I had with his guardian George Downs, about their buying the 109 acres of land over in Glascock county from Thomas Kent. I can't say, but I think it was before the deed was made from Thomas Kent to Thomas Downs. I told them that Bryant Kent's children would sue for that land and I thought there was danger about the titles to the land. I talked with George Downs about it before the deed was made to Thomas Downs, and it was generally talked in the family when Bryant Kent left Thomas Kent's and came to Mrs. Dixon's to live. He told me he was compelled to leave Thomas Kent's, that the treatment of of him was so bad he could not stand it. At the time of taking the deed from Thomas Kent, Thomas Downs knew of Bryant Kent's mental condition. Bryant's property was worth more than enough to support him during his lifetime.

T. W. Kent paid five dollars per month for his board and nursing while he staid with Mrs. Dixon. It was worth more, as he was entirely helpless a good part of the time and had to be nursed like a child.—James Marsh testified, among other things, that he bought the Glascock county place from Thomas Kent before the latter sold it to Downs, but gave it up because he found out about the title and was afraid of it; that the place at that time was worth $75 a year rent, and was worth $500; and that Downs has cut the timber off the land since he bought it. There was evidence that the horse mentioned in the deed was worth $125, that the mule was worth $100, that the sorrel mare was worth $150; and also as to the value of other property covered by the deed from Bryant to Thomas Kent. John Kennedy testified, that in 1882, about a month after Bryant Kent came to Thomas Kent's, Thomas said to witness that Bryant was pettish and he thought had nearly lost his mind and that his mind was impaired. Robert Dixon testified, that in 1883, before the deed was made from Thomas Kent to Thomas Downs, he had several talks with Downs about the land Downs bought from Thomas Kent, and told Downs that "we" (Dixon married a daughter of Bryant Kent) were going to sue for the land and he would better let it alone, that Thomas Kent had no title to it; and that Thomas Downs knew of the mental weakness of Bryant Kent when he bought the land, and was informed that the heirs would sue for it. J. L. Wilcher, who married another daughter of Bryant Kent, testified: In February, 1883, Thomas Kent brought Bryant Kent to my house and spent the night. After Bryant had gone to bed we got to talking to Thomas about Bryant making him the deed instead of his children. My wife asked Thomas why he thought Bryant made him the deed. He said he did not believe Bryant was in his right mind, or he would never have made him the deed. Bryant staid at my house about three months and Thomas brought him back there in

1885, and he staid about six months; his mind was bad all the time. I paid all the doctor's bills for him while he was at my house. Thomas Kent did not pay me anything, nor did he offer to pay me anything. I brought him back down here to Bennie Dixon's.—The wife of this witness testified, corroborating him. She testified, also, that before Thomas Downs bought the land he asked her if they were going to try to recover it, and she told him they were and that he would better let it alone; and that Downs said, Thomas Kent has too much money for the heirs to get the land back from him. Amanda Dixon testified, among other things, that her father often told her that if Thomas Kent had a scratch of a pen against him he did not know it. Her testimony and that of other witnesses tended to show, that Thomas Kent did not "keep, support and maintain" Bryant Kent "as a member of his family" during the life of Bryant. Another of Bryant Kent's daughters testified, that she heard him talk about coming off "up here" (Johnson county) before he came, and that he said then he was going to make this deed to Thomas Kent; that she heard her father talk about it after he had made the deed; and that he said he was sorry he had made the deed and given his property away. There was further evidence, that plaintiffs were all of the heirs of Bryant Kent; that he left no debts, and there is no administration on his estate; that at the time Thomas Kent sold the land to Thomas Downs, George Downs said to Thomas Kent in the presence of Thomas Downs: "You are aware that some day Bryant Kent's children are going to try for that land"; and that Thomas Kent replied: "I don't care for that; I will make you a warranty deed and defend it"; and that the administration by Bryant Kent of the estate of Jerusha Kent was all settled up, by payments made by Bryant Kent or by T. W. Kent as his agent.

*A. F. Daley* and *B. F. Walker*, for plaintiffs.
*W. R. Daley* and *Evans & Evans*, for defendants.